Case number 24-5842, Cypress Creek Equine LLC v. North American Specialty Insurance Company, oral argument not to exceed 15 minutes per side. Mr. Moore for the appellant, you may proceed. May it please the court, counsel, your honors, my name is Trey Moore and I represent Cypress Creek Equine LLC. The appellant here, the plaintiff in the case below. Your honors, I do believe a few pertinent facts are key to the discussion today. Cypress owned a thoroughbred stallion by the name of Lau Ban. Lau Ban stood at Windstar Farm here in Lexington, which is here in Central Kentucky. It's one of the largest thoroughbred breeding and racing operations there is. During the spring of 2021, during the breeding season with the stallion, Lau Ban's breeding began to slow. He was not as interested in breeding his mares, which was his job. Windstar is a large enough operation that they have on-site equine veterinarians. The equine veterinarians, one of the equine veterinarians gave Lau Ban a shot or an injection of various vitamins, vitamin C, vitamin E, just like a human being might consume, and a mineral, iron dextrose. But they mixed them together into what the vet called a black shot and then injected it into the vein, right? That's correct, your honor. They injected it into the jugular vein, which... So why isn't that just medication? I mean, when you mix them together like that, inject it into the jugular vein, you're trying to do something to treat the lethargy or whatever you want to call it of the horse. Yeah, absolutely, your honor. I think that is goes right to the heart of the unauthorized medication exclusion in this case. Those, all of those substances in that chart, no question, there were multiple things in there, but they're vitamins and minerals. When we go look at the, for example, the FDA, the FDA regulates dietary supplements, regulates drugs, regulates medications. They regulate them differently. Vitamins... But these have national drug codes and the language of the insurance policy doesn't say like regulated by the FDA. It says medication. It says, that's correct, your honor, drugs and medication. That's why the standard here that is applied or was applied or not applied is so important. The word medication and the word drug is not defined in the NAS policy. So the question here before this court is how do we interpret the unauthorized medication exclusion on these undefined terms? We're not saying that because they're undefined, these terms are inherently ambiguous. That's not the point. What we're saying though is when the court is interpreting those terms, they've got to look to the Kentucky law, Kentucky insurance law of how we interpret these types of exclusions. That's why it's so important, your honor, for the court to consider the Kentucky case of McKinney. That is in our papers and I think that's the seminal Kentucky case on insurance interpretation outside the realm of ambiguity. This is a pure interpretation of insurance policy case. That's Kentucky Farm Bureau mutual versus McKinney, the 1992 case out of the Kentucky Supreme Court. Now in that case, the issue and it's... Insurance cases are always fascinating because the... To me, because... Can you just cut to the chase, your point about this? Your view is sort of favorable to the non-drafter or you're making a more specific point? You're getting a long wind up for this case. What's the point? I remember reading it but... I think that's absolutely the point, your honor, is that under McKinney, exclusions in policies like the unauthorized medication exclusion or the proper care exclusion have to be strictly construed to make insurance effective. That's the point. That's what McKinney says and it was reaffirmed by Tower Insurance versus... They can't expand the terms. I mean, make it effective. It doesn't mean that the claimant always wins. Absolutely, your honor, but I do believe that the standard that the court... The court applied a different standard below here. The court said there's no... They didn't recognize the McKinney standards, the cardinal principles held in McKinney. Can I ask you a question? How common was this shot in the Kentucky horse breeding scene? Your honor, I am no expert in equine... Dealing with equine stallions. I think it's unusual and I believe that that's what... Excuse me, Judge. The veterinarians in this case, when they were examined under oath, they said, yeah, this is pretty unusual practice for sure. The actual veterinarian that gave this shot had experience giving similar type medications when she was not in Kentucky, when she was working at another thoroughbred center in California. So how does that... Does that cut either way or is it sort of a neutral point? I think it's a neutral point, your honor, although I think it's one where... Obviously, it's an unusual circumstance. Obviously, an insurance policy can't... Every possible factual scenario cannot be drafted into an insurance policy. We fully recognize that. That's why the Kentucky standards are so important. When we're looking at these cases, how are we going to construe it? Are we going to construe it narrowly in favor of the insurer or are we going to construe it more broadly in favor of coverage? And the Kentucky Supreme Court has said we're going to construe it more broadly in favor of coverage. How do you deal with McClendon, which said that if a contract's not ambiguous, then the construction in favor of the insured is not applicable? Your honor, McClendon is the ambiguity case in Kentucky. And McClendon says, just as you said, and that's in the event that there is an ambiguity, the reasonable expectations of the insured is the standard. Here, I don't believe that McClendon, at least alternatively, I believe McClendon applies. Here, our position is that when you take the Kentucky standards and review the plain language of the policy, it's not ambiguous. It is when you review these terms strictly in favor of the insured, like McKinney, the McClendon standard doesn't apply. Only in the event of an ambiguity would McClendon apply. Now, if this court does find that these terms are ambiguous, that is, two reasonable, susceptible interpretations of the same clause, that's where the reasonable expectations of the insured. But I thought McClendon said, if it's not ambiguous, then we just interpret the terms, and the construction in favor of the insured doesn't matter. That is what McClendon says, but I believe you still have to have the overlay of McKinney there when you're looking at the plain language of the policy. That's what McKinney says. These two kind of run in parallel. So we still look to dictionaries, for example, like the district court did, figure out what it is, and then figure out if this comes within it? I'm not sure that looking at dictionaries is the answer here, Your Honor. I believe that Where would you look? I would look at reasonableness, Your Honor. What are different reasonable interpretations of it, for example? But how do we figure out what it means? I think a dictionary would be one place to go. But, for example, what Cypress has argued throughout this case without a dictionary, just off the top of their lawyer's head, for lack of a better term, has been that the vitamins and minerals that were inoculated into this horse, or given to this horse, injected in this horse, were a dietary supplement. For example, we went to the Food and Drug Administration, where they post what their definitions are on their website. That cites in the materials before the court. And it explains, for example, that dietary supplements include vitamins, minerals. Other things are included as dietary supplements. Caffeine, botanicals, all these things. The FDA describes them as such. So I believe that, sure. Do you think something can be a supplement and a drug? That's a great question, Your Honor. And when I look at this, I believe... This shot had to be administered by a veterinarian, right? There's no rules about this particular shot, because it is unusual, as Judge Raylor suggested, Your Honor. But for a material, or a shot, or something given to an animal to be a drug, I would say it has to be for the treatment or prevention of disease. But wasn't it given to the horse for a very specific reason, to treat a very specific condition, whatever problem that was going on? The problem, I suppose, was the fact that he was lethargic or tired. I don't believe it was for the treatment of a disease. And in fact, that's what the... But it wasn't like they were giving him this shot every morning. Like, hey, you need some vitamin B12 every morning. It's, hey, you're not performing your duties. So we're trying to figure out what the problem is. We're going to give you this shot. I mean, it is a treatment, isn't it? I don't believe so in the term of veterinary. My time is up. May I finish answering your question? Yes, you may. Your Honor, I don't believe that there was any type of veterinarily diagnosed condition of this horse. I believe that he was experiencing some reluctance to breed. That's something that happens sort of like human beings that wake up every morning and have to have a cup of coffee with the caffeine to wake up. Human beings are prescribed drugs sometimes. There are ED drugs that people can be prescribed for a somewhat similar situation. That's correct, Your Honor. Those are clearly drugs. They are with a diagnosed medical condition that we did not have. This all turns on the diagnosis? This case turns on the lack of a formal medical diagnosis, in your view? I think in that comparison, I would say that, yes, Your Honor. All right. Thank you, counsel. You'll have your full rebuttal. Thank you, Your Honor. You may proceed. You may please the court. Good morning. I'm Gene Vance on behalf of North American Specialty. The district court got it right. That statement is in plain language, just like the wording of this policy. This policy is written in clear, easy-to-understand words, and the words mean what they say. There is no ambiguity, and Kentucky law requires that the policy be enforced as it is written. That is what the district court did, and that decision should be made. Can I ask you, because the district court, at page five of its opinion, and something you grasp onto, says that medicine and drug is a substance other than food intended to affect the structure or function of the body. That's extremely broad. It is, and the district court relied upon the Merriam-Webster definition, which has a number of parts, and the one that the district court relied upon is a substance used as medication in preparation of a medication. That's number one, and then, according to the Food, Drug, and Cosmetic Act, and then it cites the four provisions of that act, and the provision that you just cited, Judge Lepar, is within the Food, Drug, and Cosmetic Act. So it is something that the federal government has said constitutes a drug. That is the definition that the district court used. I mean, a substance other than food intended to affect the structure or function of the body. That's awful broad. It is broad, but again, that is what the professionals in the area have determined. Is water a medicine or drug? It's not technically food, and it is a substance that affects the function of the body. I suppose that's true, but in the context of what we're looking at here, and again, there are multiple definitions, that is one of them, but there is also, within that same subsection of Merriam-Webster, a substance recognized in an official pharmacopeia or formulary. So that's what we have here as well. And these medications— But don't we have to, I mean, don't we have to, according to Kentucky law, consider this narrowly and in favor of the insured? And you're asking for the broadest possible definition in some sense. I don't think that's correct in terms of what we're asking for. We're asking for looking at this in terms of common sense and applying the definition that the court has applied and the definition of the words that are used. But let me do common sense for a second. Most Americans take vitamins of some kind, whether it be the Flintstone multivitamin kids take or a vitamin for whatever reason. That seems to me different, and if you ask most Americans, when you take a vitamin, are you taking medicine, they'd say no. Well, I think it depends upon, again, we have to look at the facts here. We have three different vitamins and a mineral that were compounded by a veterinarian into a single shot that was— A multivitamin. Well, it may be a multivitamin, but the fact— You're speaking to a semi-health expert here. We just want to make sure you know that. I'm beginning to understand that, Your Honor. I think what we have here clearly is a series of substances that are regulated by the FDA, that are available only by prescription. Your multivitamin that you're going to get at the store is not something that you need a prescription to get. Can I ask you a couple questions about that? So is any individual ingredient a drug? Yes. Okay, which one? All three of the vitamins, specifically on their labels, the expired labels that the doctor didn't notice, on the labels they say this is a drug that may only be administered by or under the supervision of a veterinarian. Those labels are required by the FDA? Yes, they are. This is a drug that is regulated by the FDA. And if you think about it, we're talking about drugs here for animals. Animals do not have the independent ability to make decisions about what they're going to take, what they're going to do, how they're going to treat their particular condition. So can the same— I thought some of these were common vitamins that I might take, some of them. Well, but these are vitamins that are specifically formulated and marketed to animals, and they are regulated by the FDA as animal drugs. They have to be administered to the animals. So it's not like a B12 that's not— there's different forms of it, then, that you're— Of the vitamin. There's one form that can be— that humans can buy off the shelf that people probably wouldn't consider a drug, and there's another version of it that's prescribed to animals that you would say is formally a drug. Well, I would say that we're getting a bit beyond my technical knowledge of the vitamins. Maybe Judge Lepar would know, but— Well, you're the lawyer, so we're going to have to put you on the spot. But I think here, again, what we have to deal with are the facts of the case. And what we have here with respect to the facts and the record are substances, drugs, medications that are regulated by the FDA that are restricted by the FDA. But here, I just put in vitamin C for animals, and you can get it at Chewy, PetSmart, Petco. So why—I mean, I give my dog some vitamins. And I don't need the vet to prescribe it. I can't comment on the specific product that is available at Petco, but what I can say is that these medications in the pharmacy at Windstar were specifically required to be administered by a vet and only by prescription. So that is what we are dealing with in the facts of this case. And with respect to the language of the policy, I do want to come back to the points that were made previously about what Kentucky law requires here. And it is, of course, as you all know, a matter of interpretation for the court. And construction of the policy is supposed to be in favor of the insured. But, as was pointed out, you cannot create a contract that does not exist. You have to apply the language of the policy as it is written, and Kentucky is not going to engage in a strained interpretation of the policy language. An insurance policy must be enforced as drafted. And, as was pointed out, the McClendon case specifically says that the rule of liberal construction does not apply where there is no ambiguity. Can I ask you about the diagnosis point that I asked your friend about at the close of his argument? Was there any kind of formal diagnosis here? And does that matter? Well, it doesn't matter. I don't think there was in the records. There was an issue, obviously, with his willingness to engage in breeding. And so the attempt was made— That judgment was made mostly by a trainer? It was made by a stallion manager, by the breeding manager. And then they called in the veterinarian to ask what should we do to try to convince him to be, or to do something, to get him to be more interested in his day job. But the vet doesn't do a separate inspection or take blood tests or anything? But I will say, and we've noted this, it's in the record, it's in our briefs, Lauban had a long history of breeding difficulties. In fact, one of the grounds that we raised with the district court that the district court did not address was that his true health conditions were not disclosed on the application of policy, which was a material misrepresentation in the effort to provide coverage. And I would just, while we're on that point, say that the appellant said that we didn't file a cross-appeal, and so those alternative arguments— Can I go back to the question I asked? Sure. So— But would that breeding, whatever, disability, but there was no diagnosis, right? No. What would you have to, I mean, what do you have to disclose on the application? So on the application, you have to disclose any health conditions that the horse has, because that is an underwriting decision that the insurance carrier takes into account when they decide whether to issue the policy or not. But no vet had said he's got some problem that's causing— He had a documented history in his medical records, which we did not learn about until after the fact, of breeding difficulties when he was standing at stud in New York before he was moved to Kentucky. But he bred 126 times in the year before his death, so that doesn't seem like a difficulty. He did, but believe it or not, that's actually a small number in the breeding business. And what is the measurement? Like, how do you determine that's a small number? Well, I think you look at what the breeding season, which in North America typically lasts from January until late May or early June, and most breeding stallions are covering multiple mares per day, or at least a couple of mares per day in that time frame. So you can do the math. And then some of them are shipped to South America for the Southern Hemisphere breeding season. It's a full-time job for a lot of them. So can I ask you, so just back to the diagnosis point, is the role of the vet, does that help prove your case? Does this help prove your case or not prove your case? In other words, if the stable manager had just on his own gotten some vitamins, drugs, medication, whatever you want to call it, and given it to the horse, is that a different scenario than the role of the vet here coming in and at least administering the shot? That would even more clearly be excluded, because what the unauthorized medication exclusion says is the coverage does not apply for any loss caused by inoculation or administration of drugs unless done by or under the direction of a veterinarian and certified by him or her to have been for a preventive nature or necessitated by accident, sickness, or disease of the horse. And in this instance, Dr. Wharton, who gave an examination under oath, said that it was not given for any of those reasons. It was given to increase his energy in the breeding shed. And the other point that I would make while I'm talking about her examination under oath, which is in the record, counsel has said repeatedly in the brief below and even more repeatedly in the brief here and to this morning that these were dietary supplements. Dr. Wharton was specifically asked in her examination under oath if these were supplements, and she said no, they were not. So you have the veterinarian who is administering the shot specifically saying these were not supplements. And she conceded in the examination under oath that that was the case. She also has admitted, and we have not talked this morning about the proper care exclusion, which is equally applicable here. There is a determination here, agreed to by the Kentucky Board of Veterinary Examiners and Dr. Wharton, that this was not proper care. The KBVE charged her with deviation from the appropriate standard of care and instituted disciplinary proceedings with respect to her license. She entered into a settlement agreement with the KBVE that agreed that she would not contest that finding, and she was then suspended for a period of time by the board. So setting aside the unauthorized medication exclusion, there is a separate and independent basis for the coverage denial. Do you think that both subparts of that exclusion apply? Failure to provide proper care and attention and also malicious, willful, or intentional acts? Well, I certainly, obviously, the first part applies. I don't think that this was a willful or malicious act. Let me put it this way. Number two covers you, your agents, your employees, and a bunch of different parties. Number one doesn't say anything about agents, employees, or others. It just says failure to provide proper care and attention for the horse. And without covering anybody other than anybody else, I mean, I guess I would read that narrowly to say it's only the policyholder, right? It doesn't cover the agents. Like, why would the agents be covered in two and not in one? Well, I think that the policy clearly envisions both here and in other parts of the policy, because we know that an owner of a horse is rarely, an owner, certainly, of a horse like this, is rarely the person that is going to have the care custody. But don't, I mean, but you can, you write the policy. Don't we have to strictly construe that against you at that point? I mean, at that point, I agree with your friend that McKinney et al seemed to see, say, pretty clearly used the language in part two, but not part one. Well, in finishing the answer that I was giving to Judge Nelbanian's question, I do think that the administration of the shot was an intentional act. It was clearly not done accidentally. It was clearly not done without forethought. So it was an intentional act. It may not have been willful, as that term is defined in the law. It may not have been malicious, as that term is defined in the law. But there is no doubt that this did not happen by accident. It was an intentional act. And so the proper care exclusion, whether you look at it before or after the semicolon, most clearly does apply in this instance. So I think what we have here are four separate exclusions, two of which were addressed by the district court, two of which were not because of the way the district court resolved the first two. Any one of those four. Can I go back to the first part that you still haven't answered? Which is, so does that include the VAT? Does the proper care? I get now your point on the second part. Yes, I think it does include the VAT. Because we're talking about a failure to provide proper attention and care for the horse. And that applies to anyone who has the care of or responsible for the care of the horse. And, but you didn't include, like in the intentional part, you include, as Judge Nalbandian pointed out, you, your agents, etc. You could have put that very same language in the first part. That's true. We could have. But what I want to say in response to that, though, is Cyprus here made the decision as to where to place the horse and as to whose care into which to place the horse. That is a decision made by Cyprus as a part of determining what is proper care and attention for the horse. But that would include everything, right? Then it would be everyone that provides any attention to the horse would fall under that. Under the terms of, they're insuring, they're paying for the insurance of a risk. And so it's their obligation to make sure that the risk is adequately protected unless something then happens that would be covered under the terms of the policy. Any further questions? Okay. Thank you, counsel. Thank you. Your Honors, with regard to some of the points made in the appellee's argument, I want to be crystal clear about what was in this shot. What was in this shot, and it's in the press release, it's in the materials from the farm, vitamin C, vitamin B12, vitamin B complex, and iron dextrose. Those are the four things. Do you agree that those have to be prescribed for a horse? I don't. I don't believe. I don't know, Your Honor. I don't believe that's in the record that it has to be prescribed to give a horse a dietary supplement. And why I keep using the term dietary supplement, when I go to the FDA and look at dietary supplements versus drugs, common dietary supplements include vitamins, such as multivitamins or individual vitamins like vitamin D. Is that for human use or animal use that you're reading? I believe it's for both, Your Honor. I mean, the FDA, I mean, it's the FDA regulates both. If you're reading it to us, I guess I would think you would. It seems like there's a different regime for animals versus humans. I don't believe so, Your Honor. I believe it's different in that you've got to have a veterinarian versus a primary care physician. But I believe that the regulation of it is similar, if not the same. I mean, it's the same group. It's not the Department of Agriculture that's regulating equine versus the Food and Drug Administration for humans, if that answers your question. With regard to the proper care exception or exclusion here, this one is, and I believe the panel has touched upon it, so Cypress here owned the horse and then stood the horse at, the horse stood or was at Windstar Farm. Cypress doesn't own Windstar Farm, right? And that's a common business arrangement in the thoroughbred breeding industry. I don't think there's, when you're talking about Cypress and Cypress's responsibility here, Cypress picked the preeminent stallion operation, maybe in the world, to put this horse. It's an operation that has, obviously, shelter, food, and all that, on top of the fact that it's the finest facilities, coupled with the fact that there's two on-site, all-the-time veterinarians. There are very few operations that have that type of assets for a standing stallion. I mean, Cypress, to call that not proper care would be not reasonable, to say the least, in terms of common sense. And the second part of that common, excuse me, of the proper care exclusion. I'm confused, though. Do you think that what Windstar did was just fine? No, absolutely not. You had a beef with Windstar, I'm assuming, right? Absolutely, Your Honor. Yeah, absolutely. You're just saying you're not responsible, or their failure to exercise proper care is not your failure to exercise proper care? I believe the beef with Windstar was that there was medical, excuse me, medical, my other part of my practice, other than equine, veterinary professional negligence in this case, okay? Garden variety professional negligence. The exclusion, however, Judge, is for intentional type acts. Now, look, I don't believe that the intentional acts is talking about, yeah, they intended to-nobody's saying that she didn't intend to inject this horse with the vitamins. That's not it. Intentional as in intentionally killed the horse, right? Or, you know, in a tort world, talking about whether you've gone from negligence, garden variety negligence, to what, recklessness or gross negligence? It seems to me that they're, okay, maybe it's not intentional in terms of intending the consequence, but what about omissions? I mean, whoever, I mean, they ignored the expiration dates on the drugs. The one that said she wouldn't, the supervisor said, I wouldn't have done this. I mean, it seems like there are, at a minimum, there are omissions, right? I agree, and I think errors and omissions is what the garden variety professional negligence would be there of the vet. I don't believe, however, that second section of the proper use exclusion, excuse me, not proper use, proper care exclusion, covers garden variety negligence, and that's what it is. Is it negligence? Sure looks like it. I think that would be a quote unquote jury question, but the facts in the record of this case established that the veterinarian was indeed disciplined for a breach of the standard of care, which is negligence. There was never a finding of gross negligence, intentional acts, or anything of the sort with regard to the veterinarian that gave the shot in this case, Your Honors. Your Honors, I see that my time is about to expire if there are no further questions. Anything further? Thank you very much, counsel. Thank you both for your thoughtful arguments and briefing in this case. The case will be submitted. Thank you, Your Honor.